UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| GENBAND US LLC, GENBAND IRELAND LTD., GENBAND CANADA ULC, AND GENBAND INTERNATIONAL HOLDING COMPANY, | § § § § § | |
| Plaintiffs, | § § | Civil Action No. 4:13-cv-612 |
| v. | § § | |
| COMMUNICATIONS TEST DESIGN, INC., | § | |
| Defendant. | | |

**GENBAND'S COMPLAINT AGAINST CTDI
AND APPLICATION FOR PERMANENT INJUNCTION**

Plaintiffs GENBAND US LLC, GENBAND Ireland Ltd., GENBAND Canada ULC, and GENBAND International Holding Company (collectively, "GENBAND") file this complaint against Defendant Communications Test Design, Inc. ("CTDI"), and allege as follows:

**NATURE OF THE ACTION**

1.    GENBAND provides a broad base of networking solutions to both service providers and enterprises, including the sale of Digital Multiplex System ("DMS") telephone switches to telecommunications carriers across the world. Originally developed by Nortel Networks Corporation ("Nortel"), GENBAND became the sole provider of these carrier DMS switches when it purchased Nortel's Carrier VoIP and Application Solutions ("CVAS") business unit in May 2010.

2.    Until early 2011, GENBAND (and Nortel before it) outsourced most

customer repairs for these switches to third-party repair vendor CTDI.  So that it could perform the complex services GENBAND was paying for, CTDI was provided with highly confidential and proprietary technical information not available to other third-party repair companies.  GENBAND ended this relationship in 2011, choosing to move its outsourced customer repairs to a new vendor, Telmar Network Technology ("Telmar").

3.   CTDI knew that the information it received under the outsourcing relationship was GENBAND's property, and that it was not permitted to use that information for any purpose other than providing services to GENBAND.  Indeed, as its outsourcing relationship was ending, CTDI asked if GENBAND would be willing to license that information to CTDI so that CTDI could use the information in its repairs of DMS switches for carriers who chose not to go through GENBAND.  GENBAND declined to provide this license, and requested the return of all proprietary information in CTDI's possession.

4.   With no license, CTDI has no right to use GENBAND's proprietary information for any purpose.  Yet CTDI continues to use that information for its own gain.  This despite the representation CTDI made over a year ago that all such information had been returned.  In 2013 alone, CTDI has performed thousands of repairs on carriers' DMS switching equipment that it could not have performed without using GENBAND's trade secrets and proprietary information.  These actions — which are unlawful and in breach of CTDI's duties to GENBAND — have resulted and continue to result in significant harm to GENBAND, and may be

resulting in improper repairs that put the operation of carriers' networks at risk.

## PARTIES

5.    Plaintiff GENBAND US LLC is a Delaware limited liability company located and doing business at 2801 Network Boulevard, Suite 300, Frisco, Texas 75034.

6.    Plaintiff GENBAND Ireland Ltd. is a company organized under the laws of the Republic of Ireland.

7.    Plaintiff GENBAND Canada ULC is an unlimited liability corporation organized under the laws of Canada.

8.    Plaintiff GENBAND International Holding Company is a company organized under the laws of the Cayman Islands.

9.    Defendant Communications Test Design, Inc. is a Pennsylvania corporation with a principal place of business at 1373 Enterprise Drive, West Chester, Pennsylvania 19380.  CTDI has designated as its agent for service of process in Texas Registered Agent Solutions, Inc., 1701 Directors Boulevard, Suite 300, Austin, Texas 78744.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this lawsuit under 28 USC § 1331 and 15 USC § 1121, and under 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, excluding costs and interest.

11.    This Court has personal jurisdiction over CTDI because CTDI resides

in Texas; because CTDI continuously and systematically conducts, transacts, and solicits business in Texas; because CTDI contracts with Texas residents where either party is to perform the contract in whole or in part in Texas; because CTDI has committed tortious acts in Texas; and because CTDI has committed acts in Texas giving rise to the claims in this Complaint.

12.    Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to GENBAND's claims occurred in this District, and because CTDI resides in this District.

## STATEMENT OF FACTS

**A.    GENBAND's DMS switching technology.**

13.    Switches are a fundamental element of any telecommunications system.  When a call is made from any device, it is routed to a central location where it is connected through a switch or a series of switches to the recipient of the call.

14.    A century ago, all "switching" was done manually.  Like in Andy Griffith's Mayberry, central switchboards were staffed by operators who would connect calls by hand.  A user wishing to make a call would lift the handset to signal the operator, who would plug his or her "answering cord" into the subscriber's jack and ask to what number the user wanted to be connected. Depending upon the response, the operator might plug the other end of the cord (the "ringing cord") into the called party's local jack and start the ringing cycle, or plug into a trunk circuit to start what might be a long distance call handled by

subsequent operators in another bank of boards miles away.  In 1918, the average time to complete the connection for a long-distance call was 15 minutes.

15.    In the first half of the 1900s, automatic "dial service" exchanges were developed, eliminating the need for human operators to manually complete connections.  The automatic exchanges sensed when a user's phone was taken off the hook, and provided a dial tone to indicate to the user that the exchange was ready to receive a dialed number.  The pulses or tones generated by the user's telephone when each number was dialed were processed by the automatic exchange, which then established a connection to the called telephone.

16.    These early analog electronic switching systems were plagued by poor reliability and voice quality, and could only service a limited number of lines.  In the late 1970s, Nortel pioneered the development of digital switches with its DMS switch, which alleviated these issues.  Digital switches connect digital circuits according to a dialed telephone number or other instruction.  Speech or other data from one line is then encoded and sent to the receiving line where it is decoded and reconstructed.  In the early years, a single DMS switch could support more than 10,000 lines.  Today, through continued innovation, DMS platform switches have evolved to support in excess of 500,000 subscribers each.

17.    DMS switches are still prevalent in the telecommunications industry. This despite the significant technological advances and exponential growth seen in telecommunications since Nortel first released its DMS switches.  New DMS products have continued to be designed and sold since the 1970s, but the

technology's sustainability is also due to the ability to upgrade previously-sold DMS hardware as the needs of telecommunications providers change and grow.  As a result of these upgrades, the DMS switches have been maintained well beyond their originally-expected lifespan, and continue to provide the core of our telecommunications network.

18.    In February 2010, GENBAND announced that it would pay a purchase price well in excess of $100 million to acquire Nortel's CVAS business unit, which included all of CVAS's DMS switching business.  That sale closed in May 2010. GENBAND continues to design and sell DMS equipment today.

**B.    CTDI agreed that it was receiving GENBAND proprietary information, and that it was prohibited from using that information for any purpose other than providing services to GENBAND.**

19.    For more than a decade before GENBAND acquired CVAS, CTDI provided Nortel with repair services for CVAS's DMS switches.  The relationship began in September 1999, when the two companies entered into a Master Contract Repair Services Agreement (the "Agreement") under which Nortel awarded all of its outsourced DMS switch repair services to CTDI.  CVAS DMS switching equipment in need of servicing was sent to CTDI for repair, with Nortel paying CTDI for those services.

20.    CTDI performed a broad array of services on CVAS customer DMS switching equipment.  All of these services required significant technical expertise. But for several key tasks, technical expertise alone was not sufficient.  These tasks — including hardware upgrades — required a detailed understanding of Nortel's equipment and processes that could only be had through access to Nortel

confidential and proprietary information.

21.    Nortel (and later GENBAND) provided this information to CTDI under the Agreement.  CTDI acknowledged in the Agreement that this information — including all "technology . . . , ideas, formulae, plans, proposal, designs, schematics, drawings, flow charts, product and process specifications, trade secrets, know how, technical data, algorithms, databases, . . . technical reports, and . . . software used or retained for use in the provision of Services" — was proprietary and confidential.

22.    CTDI further specifically agreed that it would not use this information "for any purpose other than the performance by [CTDI] of its obligations under this Agreement."  And that at the conclusion of the relationship, it would "return . . . , destroy, or erase all copies of" all proprietary information it had received.

**C.    The proprietary information CTDI received.**

23.    For each of the DMS switching products it was to repair under the Agreement, CTDI was provided with a plethora of proprietary information, including product architecture, specifications, design information, drawings, artwork, manufacturing information and data, circuit schematics, stocklists, assembly drawings, drill data, wiring diagrams, functional schematics, piece part drawings, functional descriptions, software, firmware, and other technical data. This information was necessary to provide several of the complicated repair services CTDI performed on Nortel and GENBAND customer equipment, including hardware upgrades.

24.    From time to time, Nortel and GENBAND would develop modifications (referred to as "upgrades") to parts of the DMS switches to improve their operation.

Some of these upgrades were critical to extending the life of the equipment, or to diminishing the likelihood of catastrophic failure.

25.    The schedule of upgrades — showing whether any particular part required an upgrade, and if so, to what upgrade release number — was reduced to confidential, proprietary, and trade secret information by Nortel and GENBAND in the form of "change control" documents.  The specific changes and steps required to accomplish each upgrade were also reduced to confidential, proprietary, and trade secret information by Nortel and GENBAND in the form of engineering change orders ("ECOs") and accompanying detailed design documents.

26.    The information contained in the change control documents, ECOs, and other related documents is necessary to know, among other things: (1) that an upgrade is needed for a given part; (2) the release number to which the given part should be upgraded; (3) what changes the upgrade entailed; and (4) how to achieve those changes.

27.    Every DMS switch circuit card that came in the door at a CTDI repair facility was checked against Nortel's change control documentation.  A circuit card that had not been serviced in several years may have missed several generations of upgrades.  For example, a particular circuit card that came in from a customer for repair with what Nortel termed "version 8" hardware may, in order to meet the Nortel/GENBAND recommendations, have needed to be upgraded to "version 13" hardware before it was returned to the customer.  The same circuit card, if it came in the door at "version 9," may have needed to be upgraded to a "version 14."  The

only way to know which upgrade was required for any particular product was to look it up in the proprietary change control documentation provided to CTDI.

28.     Once a technician determined that an upgrade was necessary, he or she would need to reference further proprietary information in order to perform the complex upgrade steps.  Nortel and GENBAND ECOs walked CTDI through these steps.  The technician could not know what steps were required to perform any upgrade without the corresponding ECO, or information derived from those documents.

29.     Though this and other proprietary information was shared with CTDI pursuant to the Agreement, both Nortel and GENBAND took pains to ensure their trade secrets remained confidential.  No third party, other than those with a need to know and with a confidential relationship with Nortel or GENBAND, were given the information.  Even within Nortel and GENBAND, only those employees whose roles required them to have this information had access to it.

**D.     Soon after GENBAND acquired CVAS, the repair outsourcing relationship with CTDI ended.  And along with it, CTDI's right to use GENBAND's proprietary information.**

30.     The Nortel-CTDI DMS switch repair relationship continued essentially unchanged through the first part of 2010, when Nortel sold CVAS and its DMS switch business to GENBAND.  Upon purchasing CVAS, GENBAND entered into an Accession Agreement with CTDI, binding GENBAND to the 1999 Nortel–CTDI Agreement through May 2011.

31.     GENBAND then undertook an effort to reassess several of CVAS's historical business relationships, including its DMS switch repair outsourcing.

GENBAND planned to fold the repair of its customers' (formerly Nortel's customers') DMS switches into GENBAND's existing support and repair program, called "GENBAND*Care.*"  Through GENBAND*Care* the company provides its customers with a comprehensive suite of maintenance services for all of their GENBAND equipment.  Rather than purchase piecemeal repairs, customers subscribe to the GENBAND*Care* program and receive repairs, servicing, hardware and software upgrades, and technical support as needed.

32.    In July 2010, GENBAND put out a request for quote seeking proposals to take on the DMS equipment repair piece of the GENBAND*Care* program going forward.  Several companies were invited to participate, including CTDI.

33.    GENBAND ultimately awarded the new contract to Telmar. GENBAND and Telmar entered into their own DMS switch repair services agreement in December 2010.  Though Telmar began providing GENBAND's DMS equipment repair services in February 2011, to allow for a smooth transition GENBAND contracted with CTDI to continue providing these services for two of GENBAND's customers for the next several months.  Specifically, GENBAND contracted with CTDI to continue providing GENBAND's DMS equipment repair services for Verizon through December 2011, and for Bell Canada through March 2012.

**E.    CTDI sought — and was denied — permission to continue using GENBAND's proprietary information to service its own customers' equipment.**

34.    With the exception of the services provided for a brief time to Verizon and Bell Canada, GENBAND no longer outsourced its DMS switch repair needs to

CTDI.  But CTDI planned to continue servicing DMS equipment for customers who chose not to go to GENBAND for their repairs.  There are a handful of third-party repair companies that perform such work, but they are unable to perform the full complement of services GENBAND offers because they do not have access or permission to use the proprietary, confidential, and trade secret information required to perform several key services, including upgrades.

35.     CTDI hoped to provide this full complement of services to its own repair customers.  Recognizing that this was not possible without its continued use of the proprietary information Nortel and GENBAND had provided — and that it had no right to use this information for this purpose — CTDI sought a license to continue using for its own benefit what CTDI acknowledged was "Genband intellectual property that Genband acquired from Nortel."

36.     In May 2011, days before the expiration of the Accession Agreement, CTDI's Vice President of Sales & Marketing proposed that the parties enter into a license agreement that would allow CTDI to use the "GENBAND Confidential Information in connection with the performance of repair services for [CTDI's] own customers."  For the avoidance of doubt, CTDI's Vice President later provided GENBAND with a list of the DMS switching equipment that he acknowledged were "covered by the Genband IP ownership," and which he hoped GENBAND would "include as part of the Genband IP right to use for CTDI."

37.     GENBAND declined CTDI's proposal.  CTDI has no license to use any GENBAND proprietary information for any purpose.

**F.   CTDI purports to return all GENBAND proprietary information to GENBAND.**

38.   Some of the proprietary information Nortel sent CTDI over the years existed only at CTDI.  With Telmar now the only repair shop permitted to use this information, it was important that CTDI return that information promptly.  Because this information was necessary to perform hardware upgrades and certain other repairs, Telmar (and thus GENBAND) was unable to provide the full host of services GENBAND's customers required and expected until Telmar had this information.

39.   GENBAND first requested the return of its proprietary information in June 2011.  For months, CTDI delayed, claiming that the documents had been "quarantined" pending the resolution of a lawsuit brought by Nortel's bankruptcy estate against CTDI.  In late 2010, Nortel sued over CTDI's use of Nortel trade secrets, acquired under a different repair contract, to manufacture and sell counterfeit Nortel phones.  That lawsuit should have had no impact on CTDI's ability to provide GENBAND with what CTDI agreed was GENBAND's own property.  Still, CTDI stalled, even after reaching an agreement in October 2011 to pay $19 million to settle Nortel's claims.

40.   It was not until more than nine months after GENBAND first requested the return of its own proprietary information that CTDI purported to comply.  In March 2012, CTDI sent GENBAND documents that it represented complied with GENBAND's request for "the return of all the GENBAND documentation associated with the repair of [GENBAND DMS] products."

**G.     CTDI continues to use GENBAND's proprietary information.**

41.     GENBAND trusted that CTDI in fact returned all of its proprietary information, and that it would comply with its promise and duty to not use that information or any information derived therefrom for its own gain.  But GENBAND now knows that its trust was misplaced.  CTDI continues to use GENBAND's highly confidential and proprietary information to provide services to its own customers that it could not perform without this information.

42.     For example, earlier this year, CTDI received a piece of DMS switching equipment from its customer AT&T, shipped from AT&T's facility in Longview, Texas.  When the circuit card arrived at CTDI's repair facility it was at version 7.  Before shipping the equipment back to AT&T, CTDI upgraded the circuit card to version 13.  Precisely as GENBAND's confidential change control documentation prescribes.

43.     Not only did CTDI know *that* the switch's circuit card needed to be upgraded, it also knew *to what version* it needed to be upgraded, *what complex steps* needed to be performed to achieve the upgrade, *how* to perform those steps, and even GENBAND's own *internal numbering* of its upgrades.  That knowledge is all confidential and proprietary to GENBAND, and could only be known to CTDI by reference to proprietary information CTDI has no right to possess or use.

44.     This was no isolated instance.  In the past two years, CTDI has performed more than 10,000 upgrades and other repairs that it could not have performed without using GENBAND's proprietary information.

45.     It is clear to GENBAND that CTDI's malfeasance is no mere oversight

or misunderstanding.  A large number of the upgrades CTDI is now  performing —
using information from GENBAND's change control documentation and ECOs —
are on the very same products that CTDI's Vice President agreed in July 2011 were
"covered by the Genband IP ownership."

## CLAIMS AND CAUSES OF ACTION

46.     Each of the following claims for relief is based on and incorporates the
preceding paragraphs by reference as if fully set forth herein.

### FIRST CLAIM FOR RELIEF: BREACH OF CONTRACT

47.     GENBAND and CTDI were parties to valid and enforceable contracts,
including the Agreement (through the Accession Agreement) for the period of May
2010 through May 2011, and agreements for CTDI to continue servicing Verizon
and Bell Canada through December 2011 and March 2012, respectively.

48.     GENBAND has performed and/or tendered performance of its
obligations under these contracts.  All conditions precedent have been performed or
have occurred.

49.     CTDI has breached these contracts in multiple respects, including,
without limitation, by using GENBAND's highly confidential and proprietary
information for purposes other than to perform CTDI's obligations under the
contracts, and by failing to return or destroy that information upon the conclusion
of those contracts.

50.     GENBAND has suffered injury as a result of CTDI's actions, in an
amount in excess of the jurisdictional requirements of this Court.  GENBAND is

also entitled to its reasonable attorney's fees.

51.    CTDI's conduct has caused and is causing irreparable injury to GENBAND and, unless enjoined by this Court will continue to do so.

**SECOND CLAIM FOR RELIEF: MISAPPROPRIATION OF TRADE SECRETS**

52.    The information CTDI was provided concerning Nortel and GENBAND's DMS switches and the repair of those switches constitutes confidential information, and is comprised, in whole or in part, of valid GENBAND trade secrets.

53.    GENBAND and Nortel communicated this information to CTDI in confidence, resulting in CTDI's possession of GENBAND's trade secrets.

54.    On information and belief, CTDI has used and disclosed GENBAND's trade secrets in breach of its contractual relationship with GENBAND, and in breach of its confidential relationship with and duty to GENBAND, including such duty that arises independent to the Agreement.

55.    GENBAND has suffered injury as a result of CTDI's actions, in an amount in excess of the jurisdictional requirements of this Court.

56.    In addition, CTDI's tortious acts were willful and malicious. Consequently, GENBAND is entitled to an award of punitive damages sufficient to punish CTDI and to serve as a deterrent to such conduct.

57.    CTDI's conduct has caused and is causing irreparable injury to GENBAND and, unless enjoined by this Court will continue to do so.

### THIRD CLAIM FOR RELIEF:
### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

58.    GENBAND had particular and existing relationships with existing and prospective customers, with whom GENBAND would have done business but for CTDI's behavior.

59.    CTDI knew of GENBAND's relationships with these customers.

60.    Through dishonest, unfair, and improper means, including the misappropriation of GENBAND's trade secrets, CTDI intentionally interfered with GENBAND's relationship with these customers.

61.    CTDI's interference caused and is causing injury to GENBAND's relationship with these customers, resulting in injury to GENBAND in an amount in excess of the jurisdictional requirements of this Court.

62.    In addition, CTDI's tortious acts were willful and malicious. Consequently, GENBAND is entitled to an award of punitive damages sufficient to punish CTDI and to serve as a deterrent to such conduct.

63.    CTDI's conduct has caused and is causing irreparable injury to GENBAND and, unless enjoined by this Court will continue to do so.

### FOURTH CLAIM FOR RELIEF:
### VIOLATION OF SECTION 43(A) OF THE LANHAM ACT (11 U.S.C. § 1125(A))

64.    On information and belief, CTDI, in connection with the sale of its DMS switching product repair services, has made and continues to make false or misleading statements of fact about its services, including that CTDI is authorized and able to perform repairs that in fact require CTDI to use GENBAND proprietary information to which CTDI has no right.

65. CTDI's deceptive statements deceive or have the capacity to deceive a substantial segment of potential customers.

66. CTDI's deceptive statements are material and likely to influence customers' purchasing decisions.

67. The services CTDI is seeking to sell through the use of its false or misleading statements are in interstate commerce.

68. GENBAND has suffered and will continue to suffer injury as a result of CTDI's false and misleading statements concerning its services.

69. Because CTDI's conduct has been malicious, fraudulent, deliberate, and willful, GENBAND is entitled to recover its reasonable attorney's fees under 15 U.S.C. § 1117.

70. CTDI's conduct has caused and is causing irreparable injury to GENBAND and, unless enjoined by this Court will continue to do so.

**FIFTH CLAIM FOR RELIEF: UNFAIR COMPETITION UNDER TEXAS COMMON LAW**

71. CTDI's conduct — including its deceptive statements to customers about its services, and its use of GENBAND's proprietary information in competition with GENBAND — constitutes unfair competition under Texas common law.

72. CTDI's deceptive statements to customers deceive or have the capacity to deceive a substantial segment of potential customers, are material, and are likely to influence customers' purchasing decisions.

73. GENBAND's proprietary DMS repair information was created and

developed through extensive time, labor, skill, and money.  CTDI's use of this information in competition with GENBAND gives CTDI a special advantage in that competition.

74.    GENBAND has suffered injury as a result of CTDI's actions, in an amount in excess of the jurisdictional requirements of this Court.

75.    In addition, CTDI's tortious acts were willful and malicious. Consequently, GENBAND is entitled to an award of punitive damages sufficient to punish CTDI and to serve as a deterrent to such conduct.

76.    CTDI's conduct has caused and is causing irreparable injury to GENBAND and, unless enjoined by this Court will continue to do so.

### Sixth Claim for Relief: Conversion

77.    GENBAND owned, possessed, and had the immediate right to possession of all materials provided by GENBAND or Nortel to CTDI related to DMS switch repair, including all product architecture, specifications, designs, design information, drawings, artwork, manufacturing information and data, circuit schematics, stocklists, assembly drawings, drill data, wiring diagrams, functional schematics, piece part drawings, programs and data, functional descriptions, technical or business information, computer programs, or technology relating to the DMS switches or the repair of the DMS switches.

78.    CTDI has wrongfully exercised dominion and control over GENBAND's personal property, in a manner inconsistent with GENBAND's exclusive rights to the property.

79.   GENBAND has suffered injury as a result of CTDI's conversion, in an amount in excess of the jurisdictional requirements of this Court.

80.   In addition, CTDI's conversion of GENBAND's property was willful and malicious, and in conscious disregard of GENBAND's rights.   Consequently, GENBAND is entitled to an award of punitive damages sufficient to punish CTDI and to serve as a deterrent to such conduct.

81.   CTDI's conduct has caused and is causing irreparable injury to GENBAND and, unless enjoined by this Court will continue to do so.

**REQUESTED RELIEF AND REQUEST FOR PERMANENT INJUNCTION**

GENBAND requests the following relief:

A.   That CTDI, its officers, agents, servants, attorneys, employees, any companies owned or controlled by CTDI, and their affiliates, successors, and assigns, and all of those in active concert or participation with any of them who receive notice directly or otherwise, be permanently enjoined and restrained from possessing, accessing, using, distributing, reproducing, or creating derivative works therefrom, any information Nortel or GENBAND provided to CTDI related to the repair of DMS switches, including any of the following or any information derived therefrom: product architecture, specifications, designs, design information, drawings, artwork, manufacturing information and data, circuit schematics, stocklists, assembly drawings, drill data, wiring diagrams, functional schematics, piece part drawings, programs and data, functional descriptions, technical or business information, computer programs, or technology relating to the DMS

switches or the repair of the DMS switches.

B.    That CTDI be ordered to file with the Court and serve upon counsel for GENBAND within thirty days after entry of judgment a report in writing under oath setting forth in detail the manner and form in which CTDI has complied with the requirements of the foregoing injunction.

C.    That GENBAND recover all damages to which it is entitled as a result of CTDI's wrongful actions, including punitive damages.

D.    That GENBAND recover costs in this civil action, including all reasonable and necessary attorney's fees and expenses.

E.    That GENBAND recover pre- and post-judgment interest.

F.    That GENBAND be awarded such other and further relief as the Court may deem just and proper.

Respectfully submitted,

By    */s/ Van H. Beckwith*
Van H. Beckwith
John B. Lawrence
BAKER BOTTS L.L.P.
2001 Ross Avenue, Suite 600
Dallas, Texas 75201
Telephone:  214-953-6500
Facsimile: 214-953-6503
van.beckwith@bakerbotts.com
john.lawrence@bakerbotts.com

**Counsel for GENBAND**